UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PAUL MITCHELL, | Case No. 11-cv-02705-JST |
| Plaintiff, | |
| v. | **ORDER DENYING FIRST AMENDED PETITION FOR HABEAS CORPUS** |
| DAO VANG, Acting Warden, | Re: ECF No. 75 |
| Defendants. | |

Before the Court is Petitioner Paul Mitchell's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254.[1] ECF No. 75. The Court will deny the petition and deny a certificate of appealability.

## I.    BACKGROUND

Petitioner is currently incarcerated in a California state prison facility. After Petitioner proceeded pro se at trial, a jury convicted him of eight counts of sexual penetration by a foreign object, Cal. Penal Code § 289(a)(1); three counts of forcible oral copulation, Cal. Penal Code § 288a(c)(2); and one count of forcible rape, Cal. Penal Code § 261(a)(2). ECF No. 80-1 at 1. Those convictions were affirmed on direct review by a California Court of Appeal. *Id.* Petitioner then filed a petition for review at the California Supreme Court, ECF No. 80-2, which was summarily denied, ECF No. 80-3.

In 2011, Petitioner initiated this action by filing a petition for writ of habeas corpus in

---

[1] The Clerk of Court is directed to substitute Dao Vang in place of the previously named respondent. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 894 (9th Cir.), as amended (May 8, 1996) (rules governing relief under 28 U.S.C. § 2254 require person in custody pursuant to judgment of state court to name state officer having custody of him as respondent); *Stanley v. Cal. Sup. Ct.*, 21 F.3d 359, 360 (9th Cir. 1994) (respondent in habeas petition is warden of facility in which petitioner is incarcerated).

United States District Court
Northern District of California

federal court.  ECF No. 1.  Judge Saundra Brown Armstrong, who previously presided over the case, issued an order to show cause, ECF No. 12, and Respondent filed a motion to dismiss for failure to exhaust state remedies, ECF No. 14.  Judge Armstrong granted the motion to dismiss and stayed the case to permit Petitioner to exhaust remedies pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005).  ECF Nos. 44, 48.

In 2014, Petitioner filed a petition for habeas corpus at the California Supreme Court.  ECF No. 80-4.  The California Supreme Court summarily denied the petition.  ECF No. 80-5.

In 2015, Petitioner filed a first amended habeas petition in federal court asserting twelve claims for relief.  ECF No. 75.  Judge Armstrong issued an order to show cause, ECF No. 77, and Respondent again moved to dismiss, ECF No. 80.  Judge Armstrong granted the motion to dismiss for failure to exhaust several claims and ordered Petitioner to determine how he wished to proceed. ECF No. 103.  After several efforts to permit Petitioner to comply with that order, ECF Nos. 107, 113, 121, 127, Judge Armstrong dismissed the amended petition without prejudice, ECF No. 137.

In 2017, Petitioner filed another petition for habeas corpus at the California Supreme Court.  ECF No. 151-1 at 2.  The California Supreme Court summarily denied the petition.  ECF No. 151-2.

In 2019, Judge Armstrong granted a motion for reconsideration and vacated her prior order of dismissal and judgment.  ECF No. 150.  Respondent then filed the present motion to dismiss claims four, six, seven, eight, nine, ten, eleven, and twelve of the first amended petition. ECF No. 151.  In response to a request from Petitioner, Judge Armstrong appointed counsel and stayed the case.  ECF No. 154.  Several years of extensions and COVID-19-related delays to the briefing schedule followed.

In 2022, Petitioner voluntarily dismissed claims four, eleven, and twelve of the first amended petition, ECF No. 190, and the case was transferred to the undersigned, ECF No. 194.  On June 20, 2023, the Court granted Respondent's motion to dismiss claims six through ten of the

first amended petition as procedurally barred.  ECF No. 199.  Respondent then filed her[2] answer to Petitioner's first amended petition on August 16, 2024, ECF No. 214, and Petitioner filed his traverse on January 28, 2025.  ECF No. 222.

## II.    STATEMENT OF FACTS

The following facts are taken from the opinion of the California Court of Appeal[3] on direct review:

> Elizabeth Doe testified that, in 1997, she lived alone in an apartment in Berkeley.  Sometime shortly after midnight on May 18, 1997, Elizabeth returned to her apartment, which was located on the floor above a carport, after having dinner at a friend's house.  She undressed, got into bed, and fell asleep.  She was awoken from a deep sleep when someone pounced on her, landing on her midsection.  The assailant pulled the covers over her head and clamped a hand over her mouth.  Elizabeth could not move because the weight of his body was on top of her.  She was not able to see anything, but she detected a strong smell of body odor, dirt, and cigarette smoke.  The assailant pressed a hard and cold object against her body and told her: "Be quiet, be quiet.  Do as I say and I won't hurt you."  Elizabeth Doe decided that "[her] best chance for surviving this was to do what he said."
>
> The assailant asked "[w]hat time is your boyfriend coming home?"  After telling him no one was coming home, the assailant placed a pillowcase over her head, stuffed a wad of paper towels in her mouth, and tightened the pillowcase around her neck.  The assailant then began massaging Elizabeth's body, manually stimulating her, and penetrated both her vagina and anus with his finger.  He then orally copulated Elizabeth.  Next, the assailant told Elizabeth to get up and led her, by the arm, into her living room.  He removed the gag from Elizabeth's mouth, asked her to show him where she kept liquor, loosened the pillowcase, handed her a bottle of liquor, and told her to drink.  After he was not satisfied with the few, small sips Elizabeth took, she feigned swallowing more alcohol.  He then led Elizabeth to a chair, where he again penetrated her vagina and anus with his fingers.
>
> The assailant then moved Elizabeth to the other side of her living room, sat her on a wooden chair, and began massaging her again.  At one point, Elizabeth lost her balance and reached out to catch her fall.  Her hand landed on the assailant's thigh, which she described as "hairy" and "[not] very big around."  The assailant commenced

---

[2] Respondent at that time was Gena Jones, Warden.

[3] The Court has independently reviewed the record as required by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the facts is supported by the record.  The Court further notes that Mitchell has not challenged the sufficiency of the evidence.

touching and penetrating her vagina and anus with his fingers once more. The assailant then took Elizabeth by the arm and led her back to her bedroom. He asked her to drink and she complied by pretending to swallow from the liquor bottle he handed her. He then again penetrated Elizabeth's vagina and anus. He told Elizabeth: "You're a really wonderful lover. I'm really enjoying your body very much."

The assailant then ordered Elizabeth to get on her hands and knees. He laid on the bed and pulled Elizabeth down on top of him so that they were lying chest to chest. He loosened the pillowcase, raised it just enough to expose Elizabeth's mouth, and began kissing her on the lips. The assailant reminded her that he had a weapon and made it clear that he wanted her to open her mouth. Elizabeth could tell that her assailant had very full lips and some facial hair both on his upper lip and his chin. Next, the assailant pushed Elizabeth's head down towards his groin, saying, "Don't worry. I'm clean. No STDs." The assailant placed his penis in Elizabeth's mouth and, when she remained motionless, he began thrusting until he ejaculated.

The assailant led Elizabeth back to the sofa in the living room where he orally copulated her. He then led her back to the bedroom, ordered her to lie on the bed face down, massaged and spanked her buttocks, rubbed his penis on her, ordered her to turn over, and then penetrated her vagina with his penis. He ordered her to lie next to him, took her arm and draped it over his torso, and said "I hope you're enjoying loving me as much as I'm enjoying loving you." . . .

Elizabeth told the assailant, in an effort to get him to leave, that she was running the Bay to Breakers the next day with friends and that they were coming to pick her up very early in the morning. . . .

After hearing the assailant leave and waiting several minutes, Elizabeth walked around the apartment to ensure she was alone, removed the pillowcase from her head, and locked her door. Elizabeth then used her computer to phone the police. The police arrived, took Elizabeth to the emergency room where samples were collected for a sexual assault kit, and took her statement at the police station. Elizabeth described the assailant to police as likely an African–American male, with facial hair, who was of average height and medium build, and who wore a band around his wrist. She also indicated that he had a slight Caribbean accent. The police dusted for fingerprints at Elizabeth's apartment, collected evidence, including several pieces of black-colored hair, and took photographs. A fresh, latent fingerprint was found on a vase in Elizabeth's bedroom. None of Elizabeth's fingerprints were found at the scene.

Sperm was found on both the vaginal and rectal swabs from the sexual assault kit. DNA evidence from the sperm on the vaginal swab was extracted and analyzed. A genetic profile for the sperm on the vaginal swab was generated and placed into the Combined DNA Index System (CODIS), a national computerized database of both evidentiary and known DNA profiles. Several years later, in 2005, there was a "cold hit" on the evidentiary DNA profile, indicating a match with a database known DNA profile for Mitchell. The Berkeley police department was informed of the match.

United States District Court
Northern District of California

The latent fingerprint lifted from the vase was also matched to fingerprint exemplars for Mitchell. The comparison revealed that "the latent was made by the subject Paul Mitchell" and that "it probably was made shortly before [police] came and processed the scene." Mitchell was arrested on July 1, 2005.

After Mitchell's arrest in 2005, the Berkeley police department obtained an additional DNA sample from Mitchell to confirm the "cold hit" from the database. The 2005 sample matched the profile from the sperm found on the vaginal swab. In 2006, another sample was obtained from Mitchell. Again, the DNA matched that from both the vaginal swab and the 2005 sample. The criminalist who analyzed the DNA evidence, and who qualified as an expert in DNA analysis and interpretation, testified: "Unless there is an identical twin, in my opinion . . . Mitchell was the source of the DNA on the vaginal swab." She further testified that "the probability that a random unrepresented individual who by chance possessed the DNA profile in the vaginal swab is estimated to be one in 2 quintillion for African–Americans. . . ."

As discussed post, Mitchell proceeded pro per at trial. The defense presented the testimony of four witnesses: Henry Wellington, Thomas Graber, Rosalind Berger, and Barbara Thomas. Wellington testified that he arrested Mitchell, on July 1, 2005, on two minor vehicle code warrants. Wellington knew at the time that Mitchell was a person of interest in an ongoing investigation. Graber, who was a neighbor of Elizabeth's, testified that, on the night of the attack, he heard noises of metal on metal and metal on wood. He then saw an unidentified person walk into view at the bottom of the apartment driveway. Graber did not know who attacked Elizabeth. Berger, an acquaintance of Mitchell's, testified that, in 2005, she had allowed Mitchell to sleep in a camper she had parked close to a city maintenance yard where Berkeley police cars parked. She testified that the lock on the camper did not work and she probably would not have noticed if an intruder had entered the camper. Barbara Thomas, who represented Mitchell at his preliminary hearing, confirmed that Elizabeth Doe could not identify Mitchell as the assailant at that time. Mitchell did not testify.

After less than one full day of deliberation, the jury found Mitchell guilty of eight counts of sexual penetration by a foreign object, three counts of forcible oral copulation, and one count of forcible rape. The jury also found enhancement allegations under section 667.61, subdivisions (c), (d)(4), and (e)(6), to be true. Mitchell was sentenced to imprisonment for a total term of 55 years to life.

*People v. Mitchell*, 2010 WL 259083, at *1–4 (Cal. Ct. App. Jan. 25, 2010) (footnotes omitted).

## III.    STANDARD OF REVIEW

Under AEDPA, this Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may not grant a petition challenging a state conviction or sentence on the

5

basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d). Additionally, habeas relief is warranted only if the constitutional error at issue "had substantial and injurious effect or influence in determining the jury's verdict."  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).  "This means that a state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Shoop v. Hill*, 586 U.S. 45, 48 (2019) (quoting *Harrington v. Richter,* 562 U.S.

86, 103 (2011)).  The more general the rule applied, the more leeway state courts have.  *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (internal quotation omitted).

The district court reviews the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).  The California Court of Appeal was the highest state court to have reviewed Mitchell's claims in a reasoned decision; the California Supreme Court denied his petition for review.  Accordingly, the Court here reviews the January 25, 2010, unpublished disposition of the California Court of Appeal.

## IV.    DISCUSSION

Following the Court's previous order dismissing several of Mitchell's claims for relief, Mitchell raises four claims for a writ of habeas corpus, arguing that: (1) his due process rights were violated when the trial court denied his requests for the appointment of counsel; (2) affirming the denial of Mitchell's request for a continuance during his trial was an unreasonable application of the law; (3) the state appellate court unreasonably determined that the trial court did not violate his constitutional rights by having him shackled and removed from the courtroom during closing argument; and (4) it was an unreasonable application of law for the state court to determine that advisory counsel did not violate Mitchell's right to self-representation.

### A.    Decision Not to Appoint Counsel

Mitchell argues that he "was denied his constitutional right to counsel when the appellate court found no error in the trial court's decision to not reappoint counsel to represent him shortly before trial was set to start, and after Mr. Mitchell had previously exercised his right to represent himself."  ECF No. 222 at 6.

The California Court of Appeal summarized the background surrounding Mitchell's representation by various appointed counsel and his various invocations of his *Faretta*[4] right to self-representation as follows:

> On August 15, 2005, the court granted the motion of Mitchell's retained counsel, John Taylor, to withdraw on the basis of conflict with his client. Mitchell then indicated that he did not wish to represent himself or to be represented by the public defender, but

---

[4] *Faretta v. California,* 422 U.S. 806, 832 (1975).

United States District Court
Northern District of California

would seek to retain another attorney. It appears that Mitchell was unsuccessful in this attempt, and on a date not reflected in the record before us, the public defender was appointed to represent Mitchell. On May 16, 2006, Mitchell made a Marsden motion, asking the court to discharge the deputy public defender, and either appoint new counsel, or permit him to represent himself. The motion was granted and Mitchell's case was referred to conflicts counsel. On May 22, 2006, after two attorneys declined to accept the appointment, Mitchell moved to represent himself, under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). The court advised Mitchell on the record of the consequences of self-representation, found a knowing and intelligent waiver of the right to counsel, and granted the motion.

Although the record is again incomplete on this issue, it appears that Mitchell nonetheless accepted the appointment of attorney Barbara Thomas at some time in May 2006. On November 3, 2006, Thomas represented Mitchell at his preliminary hearing, after his Marsden motion to relieve her was denied.

At his arraignment on the information, Mitchell again made a *Faretta* motion for self-representation. The motion was denied on the basis that Mitchell had accepted, if not requested, appointment of counsel after his prior *Faretta* motion had been granted. Attorney Thomas then declared a doubt as to Mitchell's mental competence and proceedings were suspended, pursuant to section 1368.

Mitchell was found competent to stand trial, and when proceedings were reinstated on January 26, 2007, Mitchell renewed his motion to represent himself before Judge Kenneth Kingsbury.

. . .

Mitchell was further advised: "[I]f you wish to change this, make sure that you do so well in advance of a trial date if a trial date has been set because one of the major triggers here is if a trial date has been set and a lawyer comes in to try to enter into your case, which has to be done by motion or approved by the court, and the first words out of the lawyer's mouth or nearly the first words are: By the way, I can't go to trial on this date. I need a continuance of six weeks, two months, three months to do independent investigation. [¶] . . . [¶] That's probably going to be frowned upon. So I can't advise you, but I will tell you that if you are going to turn away from *Faretta*, if you are satisfied that's the wrong thing to do in the future, it's much more likely to be granted if no trial date has been set." Mitchell's motion was granted.

In March of 2007, Mitchell made several requests, to both Judge C. Don Clay and Judge Kingsbury, for the appointment of advisory counsel. These requests were denied. Mitchell's motion for the assistance of an investigator was granted and several different investigators were appointed. In November 2007, another request for advisory counsel was denied by Judge Clay.

*Mitchell*, 2010 WL 259083, at *4–5 (footnotes omitted).

The Supreme Court has not established a "specific legal rule" on the issue of "whether and

8

United States District Court
Northern District of California

under what conditions a defendant who validly waives his right to counsel has a Sixth Amendment right to reassert it later in the same stage of his criminal trial." *John-Charles v. California*, 646 F.3d 1243, 1249 (9th Cir. 2011) (internal quotations omitted).  There is thus no "clearly established" Supreme Court precedent for the claim that a habeas petitioner was "constitutionally entitled to the reappointment of counsel." *Id.*  But a federal court in a habeas corpus proceeding may still assess whether "a state court's denial of a request for reappointment of counsel after a *Faretta* waiver constitutes an unreasonable application of the general principles enunciated in *Gideon* and *Faretta.*" *Id.*

Once a defendant has commenced trial representing himself, it is within the trial court's discretion to determine whether he may change his mind and assert the right to appointment of counsel.  *See People v. Gallego*, 52 Cal. 3d 115, 163–64 (1990); *People v. Elliott*, 70 Cal. App. 3d 984, 993 (1977).  The trial court considers the totality of the circumstances in making this determination, often including the consideration of these factors: "(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney."  *Elliott*, 70 Cal. App. 3d at 993–94.

Mitchell first argues that the state courts had unreasonably determined that Mitchell did not unequivocally request to "withdraw his *Faretta* waiver and reassert his right to counsel."  ECF No. 222 at 10 (quoting *Mitchell*, 2010 WL 259083, at *8).  He then argues that the appellate court erred in determining that "even if Mr. Mitchell had unequivocally requested counsel, the trial court did not abuse its discretion in denying that request."  *Id.* (citing *Mitchell*, 2010 WL 259083, at *8).

Regarding Mitchell's first argument, the California Court of Appeal recounted Mitchell's reassertion of his right to counsel as follows:

> On January 28, 2008, the case was assigned to Judge Cartwright for jury trial. Mitchell again requested advisory counsel, standby counsel, or cocounsel. Judge Cartwright noted that a prior judge had denied similar requests and "[she was] not going to re-rule on that."

Mitchell did not, however, indicate that he wished to terminate his self-representation. Instead he made it clear that he still wished to represent himself, but wanted advisory counsel appointed to assist him. On February 4, Mitchell told Judge Cartwright that he had elected self-representation because "I had a plan. My plan was to go pro per and then get advisory counsel. I messed up in that I got the pro per but I didn't get the advisory counsel." On the following day, he said "It may seem that I've wanted to represent myself. I've only used that as a vehicle so that I could get to represent myself with either co-counsel or represent myself with advisory counsel." On February 6, the trial court conducted a hearing to ensure that Mitchell was receiving adequate propria persona services. The court also appointed a new investigator.

On February 20, after a jury panel was sworn, Mitchell informed the trial court: "I have a problem with not having an attorney." The trial court did not respond. Later that same day, Mitchell learned that Dr. Blake, a DNA expert that Mitchell had sought to engage, declined to work with self-represented defendants. Mitchell stated: "I need an attorney." Again, the record does not reflect any response from the court.

On February 21, before opening statements were made, the record reflects the following discussion:

"MR. MITCHELL: And the other thing I'd like to state for the record before we begin is that my participation in these proceedings are not in any way to reflect that I am still not asking for an attorney.

"THE COURT: We've gone through that and I told you I don't want to hear another word about it. We've already decided. You said you wanted to go pro per. That's what you're doing. You're not going to stand up here every single day and put that on the record.

"MR. MITCHELL: I said it was everyday I was going to say I wanted an attorney.

"THE COURT: We don't need to hear it everyday.

"MR. MITCHELL: The other thing is I do intend on cooperating with the Court. But like I said, I want to state for the record I am doing this under duress and I do want an attorney.

"THE COURT: Have a seat. That's enough of that.

"MR. MITCHELL: I'm telling the truth.

"THE COURT: We've heard that 50 times.
"MR. MITCHELL: You're going to hear it 100 times.

"THE COURT: We understand it. And you're proceeding pro per.

"[THE PROSECUTOR]: I would like to make a clarification, because the request today is [a] little bit different, which is just an attorney where in the past it's been other co-counsel or advisory attorney which is different. And I do think that the defendant should make a

clarification for the record if he's requesting an attorney or if he's requesting advisory counsel or to be co-counsel. Those are different.

"THE COURT: We've already gone through all of these. He asked for and was given attorneys twice. He got rid of them.

"MR. MITCHELL: The judge got rid of them.

"THE COURT: After you requested that they do so.

"MR. MITCHELL: Which they don't do unless they see it's valid to do so.

"THE COURT: You asked for them to be released. We're not going over that.

"MR. MITCHELL: Judges don't release because they ask for—

"THE COURT: Excuse me. Excuse me. They released them. You got another one. You could have had another. You could have had a third one, and you decided you wanted to go pro per. And that's where we are today. [¶] Advisory counsel, Judge Clay ruled on that. Co-counsel is not available because you're not a lawyer. And—

"MR. MITCHELL: But I'm performing as a lawyer.

"THE COURT: Exactly. You're going pro per."

Again, on February 25, after opening statements had been made, two witnesses had testified, and a third had begun his testimony, Mitchell again requested counsel. The court denied the request. Additional testimony was taken on February 26 and February 27. On February 28, trial was recessed due to medical issues Mitchell was experiencing. Trial resumed on April 15, when Mitchell was medically cleared following surgery on March 7. During the recess, the court reconsidered its ruling on appointment of counsel, apparently on its own motion, and on March 10 appointed advisory counsel.

*Mitchell*, 2010 WL 259083, at *5–6 (footnotes omitted).

The appellate court explained that the trial court could reasonably have determined that Mitchell's statements were not unequivocal requests for the appointment of counsel but rather could have been understood as a request for advisory counsel, which he had no constitutional right to. *Id.* at *7. It then spent a majority of its analysis explaining why "even if we were to assume that Mitchell then unequivocally requested a new trial attorney, we still reject Mitchell's argument that the trial court necessarily abused its discretion by failing to mention all of the [pertinent] factors on the record each time Mitchell requested reappointment of counsel." *Id.* at *8.

As illustrated in the background above, the appellate court noted Mitchell's long history of

cycling between attorneys and self-representation, including the trial court's many warnings that he may not be able to request counsel if he decided to proceed pro se—emphasizing the late stage of the long-delayed proceedings and the trial court's determination that Mitchell had engaged in gamesmanship with respect to representation. *Mitchell*, 2010 WL 259083, at *10. Specifically, the court of appeal also noted that Mitchell presented "ever-shifting justifications" for his late request to terminate self-representation and that "combined with Mitchell's history of *Faretta* and *Marsden* motions, could well have reinforced the trial court's view that Mitchell was simply attempting to manipulate the system." *Id.* Indeed, "Mitchell did not seek reappointment of any of his prior attorneys who might have had some familiarity with the case—and with whom he had asserted conflicts. New counsel would have obviously required a more substantial continuance to be prepared to meaningfully assist Mitchell." *Id.*

The Court agrees and finds that the California Court of Appeal's conclusion was not unreasonable. "Even if [Mitchell's] statement could be construed as requesting counsel . . . , 'a court must be wary against the "right of counsel" being used as a ploy to gain time or effect delay.'" *United States v. Hantzis*, 625 F.3d 575, 583 (9th Cir. 2010) (quoting *United States v. Kelm,* 827 F.2d 1319, 1322 (9th Cir.1987), *overruled on other grounds by United States v. Heredia,* 483 F.3d 913, 920 (9th Cir.2007) (en banc)) (finding that "the district court did not err in requiring [the defendant] to proceed pro se" where he had previously hired and fired appointed counsel repeatedly throughout the proceedings and managed to delay sentencing for three years after trial).

### B.    Denial of Continuance

Trial courts have "broad discretion" in determining whether continuances should be granted, and "only an unreasoning and arbitrary 'insistence upon expeditiousness in face of a justifiable request for delay'" is constitutionally impermissible. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). The Supreme Court has explained that there are "no mechanical tests" in deciding whether the denial of a continuance violates due process. *Ungar*, 376 U.S. at 589. Instead, the "answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the

United States District Court
Northern District of California

1    time the request is denied." *Id.* Moreover, the improper denial of a requested continuance

2    warrants habeas relief only if there is a showing of actual prejudice to petitioner's defense

3    resulting from the trial court's refusal to grant a continuance. *See Gallego v. McDaniel*, 124 F.3d

4    1065, 1072 (9th Cir. 1997).

5         In considering whether the denial of a continuance implicating a defendant's Sixth

6    Amendment right to counsel—including the right to represent himself at trial—is an abuse of

7    discretion, the Ninth Circuit has applied the factors set forth in *United States v. Robinson*, 967

8    F.2d 287, 291 (9th Cir. 1992): "whether the continuance would inconvenience witnesses, the

9    court, counsel, or the parties; whether other continuances have been granted; whether legitimate

10   reasons exist for the delay; whether the delay is the defendant's fault; and whether a denial would

11   prejudice the defendant." *Id.* (quoting *United States v. Studley,* 783 F.2d 934, 938 (9th Cir.1986)).

12   But the ultimate test remains whether the trial court abused its discretion through an "'unreasoning

13   and arbitrary "insistence upon expeditiousness" in the face of a justifiable request for delay.'"

14   *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (quoting *Morris*, 461 U.S. at 11–12).

15        The California Court of Appeal summarized the background relating to Mitchell's requests

16   for a continuance as follows:

17        The record reflects that Mitchell had previously been granted a
         continuance of trial from October 2007 until January 28. On January
18        7, Mitchell submitted pretrial motions, again requesting a
         continuance. At the time the matter was assigned for trial, however,
19        he advised the court that the purpose for the requested continuance
         had been to allow him to locate another attorney, and he then asked
20        that the request be stricken.

21        On February 14, after the trial court indicated its readiness to call for
22        the jury, the record reflects the following colloquy:

23        "DEFENDANT MITCHELL: Good morning to the court officers.
         There's been some new developments. I went to the hospital
24        yesterday, as you may or may not be aware, and I don't have the
         paperwork with me and I can't confirm it, of course, but the diagnosis
25        was that I have a critical heart disease and I may need, I may need an
         operation.

26        "THE COURT: Well, I'm sure if that was something that happened
27        yesterday, they would have kept you in there. If you needed it
         urgently, they would have kept you in the hospital.

28        "DEFENDANT MITCHELL: Well, the evaluation was made and the

13

examination was made and the information has to be further reviewed by a cardiologist to see how imminent the operation would be.

"THE COURT: All right. Well, you let me know when they say that .[¶] Who is the doctor?

"DEFENDANT MITCHELL: The doctor at the institution?

"THE COURT: Who examined you?

"DEFENDANT MITCHELL: Two technicians that ran this big machine, what do you call it, echocardiogram machine.

"THE COURT: I don't know.

"DEFENDANT MITCHELL: I saw them write the information on the form. They have to send it back to the institution. Then the doctor at the institution, Dr. Orr, has to confer with a cardiologist and I don't know who that will be.

"THE COURT: I can assure you if it was a critical thing with your heart, they would have not let you leave the hospital. They would have done it immediately.

"DEFENDANT MITCHELL: All I'm saying is I saw them write 'critical.'

"THE COURT: Well, they didn't tell us critical. [¶] All right. We will continue."

Mitchell submitted a declaration with his written motion papers, which provided: "Defendant was apprised that he has critical heart disease complications by staff at Highland Hospital. ECG exam and evaluation results will establish how imminent is surgery to correct the problem." The trial court denied the motion for a continuance, stating: "I'm not going to continue a case at this point when we have all of these jurors out here. I am not. Okay? You are not in the hospital. I got a note dated December—I'm sorry—February 1, from the staff doctor, Dr. Wilson, and he said you had seen him for a number of complaints and I have a report here that there's nothing urgently wrong with you right now." Mitchell then indicated that he was going to ask his investigator "to go to the hospital and get the documentation [so that he could] submit that as soon as possible ." The court indicated: "All right. That's fine. You can do whatever you need to do. . . . [¶] . . . [¶] In the meantime, we're calling for the jury now."

When Mitchell asked for clarification, the court confirmed that Mitchell's motion for a continuance was denied: "I'm not saying you concocted anything. I'm just saying it's been my experience if someone has a serious heart problem and they are in the hospital, they would keep them in the hospital, they won't let you go home and meander around. [¶] Plus a technician is not equipped to say you have a serious heart problem. That's for the heart doctor, who is a thoracic surgeon. . . . [¶] . . . [¶] . . . [I]f I hear from a heart doctor, they are probably telling me that you need to be in the hospital, which I will

honor if they tell me you need to be in the hospital. But a technician doesn't know, all they do is run those machines. [¶] Okay. Let's go. Those people are standing outside and we're not going to delay this proceeding any further."

Two weeks later, on February 28, the court stated on the record, outside the presence of the jury: "[W]e received a call this morning from our deputy, who informed us that [Mitchell] had gone in for an Echo exam the other day. And then they called him and said he had to come back immediately because he had a critical valve, heart valve condition. So he's scheduled for an appointment today, and it's possible that he may have to have surgery. [¶] . . . [¶] So what we want to do is just make a record . . . that we can't proceed today because of Mr. Mitchell's medical condition." On March 3, proceedings were continued to March 10 because Mitchell was scheduled for surgery the next day.

On March 10, the trial was continued to April 16. The trial court stated on the record: "I spoke with the doctor, Dr. Coyness Ennix, who performed the surgery on [Mitchell] last Friday. That would have been March 7th. Dr. Ennix informed me that the defendant is doing very well. He replaced the aortic valve. He said that valve had to be replaced and it's something that needed to be done then. It wasn't anything that could have waited. He was in the down stages so it was a[n] open heart surgery. And he was in intensive care for a few days but now he's . . . on a regular floor. He's sitting up. He should be back to Santa Rita by this Friday. And he said he needed about a month to totally recover. That's why I was looking at the 15th of April."

On April 15, approximately five weeks after his surgery, Mitchell appeared in court and the court noted: "I did speak with Dr. Harold Orr, who is the doctor who is in charge of the medical facility at Santa Rita. Dr. Orr indicated to me that Mr. Mitchell was medically stable and that he was clear for trial. . . . [¶] . . . [B]ased on your medical situation, the Court appointed . . . advisory counsel." Later that day, Mitchell did not explicitly request a continuance, but told the court: "Your Honor, I'm incapable of proceeding with these proceedings because I don't understand what's going on. . . . [¶] . . . [¶] I just said that I am not prepared. I'm not functioning to be able to proceed with these proceedings." Mitchell also complained that his chest hurt. Mitchell asserted that Dr. Ennix, who performed the heart surgery and had not seen Mitchell since, had recommended Mitchell not proceed with trial until after April 30. Proceedings resumed, over Mitchell's objection.

*Mitchell*, 2010 WL 259083, at *11–12 (footnotes omitted).

Mitchell argues that the appellate court unreasonably applied the law by rejecting his due process claim regarding the trial court's denial of a trial continuance following his emergency open-heart surgery. ECF No. 222 at 15. He contends that the trial court acted arbitrarily in relying on a jail doctor's conflicting opinion that Mitchell was ready for trial on April 15, rather

than on the opinion of Mitchell's heart surgeon who recommended a trial date of April 30 or later. *Id.* To support his argument, he notes that he was a self-represented defendant in custody, which made his recovery and preparation significantly more difficult than for a typical patient. *Id.* at 16.

In rejecting Mitchell's constitutional claim here, the appellate court provided the following reasoning:

> Nor did the trial court abuse its discretion by resuming proceedings on April 15, rather than on April 30. The trial court did continue the trial so that Mitchell could recover from surgery. Even assuming that Mitchell properly raised the issue of a further continuance, the trial court was not required by anything contained in Dr. Ennix's letter to continue trial until April 30. (*People v. Medina* (1995) 11 Cal.4th 694, 739 [trial court had no sua sponte obligation to continue trial absent request]; *People v. Mazoros* (1977) 76 Cal.App.3d 32, 41 [medical reports are not determinative but only a factor considered by the court].) The trial court reasonably relied on Dr. Orr's opinion because Dr. Orr had more recent contact with Mitchell. Furthermore, the trial court indicated its understanding that Dr. Ennix's letter was "based upon the general ways things generally go," that it did not indicate any unusual situation, and that Dr. Ennix "had not seen [Mitchell] since the surgery." The record does not contain any evidence, beyond Mitchell's vague complaints, that specifically supports his current assertion that he "was required to proceed to trial with an attorney who was ill and did not possess the cognitive abilities necessary to adequately defend [himself]." The trial court in fact observed otherwise. We cannot say that the trial court abused its discretion. Having found no abuse of discretion, we also reject Mitchell's constitutional claims.

*Mitchell*, 2010 WL 259083, at *13 (footnote omitted).

Given the high degree of discretion afforded to trial courts in deciding whether to grant continuances, the appellate court did not unreasonably apply any clearly established law in affirming the trial court's denial of the continuance. As the state courts pointed out, the record contained at least some medical evidence—the opinion of Dr. Orr who was the doctor who had most recently seen Mitchell—supporting a return to trial on April 15. Mitchell has thus not shown that the California Court of Appeal's ruling was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Shoop*, 586 U.S. at 48 (quoting *Harrington*, 562 U.S. at 103); *see also Sexton*, 585 U.S. at 968 (explaining that the more general the rule applied, the more leeway state courts have).

United States District Court
Northern District of California

Furthermore, Mitchell has not adequately shown any actual prejudice to his defense resulting from the trial court's refusal to grant a continuance to warrant habeas relief, *see Gallego*, 124 F.3d at 1072, as the witness testimony and DNA evidence against him was overwhelming. *See Murray v. Becerra*, No. 16-CV-05640-HSG, 2019 WL 487651, at *9 (N.D. Cal. Feb. 7, 2019) (finding that any error was harmless because "of the weight of the evidence of Petitioner's guilt," including several witnesses linking the petitioner's DNA to the victim's vaginal swab); *Wyrick v. Newland*, No. C 03-5623 JSW, 2007 WL 760529, at *9 (N.D. Cal. Mar. 9, 2007) (finding a lack of prejudice where the "Petitioner faced overwhelmingly inculpatory evidence at trial that established his guilt beyond a reasonable doubt: witness testimony, the results of a post-incident medical examination of his victim, and a precise DNA match-only one in 380 billion African-Americans could have the same genetic profile-between semen found on her person and a sample taken from Petitioner in 1998).

### C.      Having Mitchell Shackled and Removed from the Courtroom

Mitchell argues that it was "unreasonable for the state court to conclude Mr. Mitchell was violent, disruptive and could be shackled and removed from the courtroom in front of jurors" during closing arguments.  ECF No. 222 at 16.  Specifically, Mr. Mitchell argues that (1) the court did not provide a sufficient warning prior to shackling him and so unreasonably determined that Mitchell was violent or disruptive, and (2) the shackles and removal were not a harmless error because it occurred during closing arguments.  ECF No. 222 at 20.  The Court disagrees.

A criminal defendant has the right to appear before a jury free of restraints because of "the presumption of innocence" and concerns that "physical restraints may not only cause jury prejudice and impair the presumption of innocence, they may also detract from the dignity and decorum of the proceeding and impede the defendant's ability to communicate with his counsel." *Duckett v. Godinez*, 67 F.3d 734, 747-48 (9th Cir. 1995) (citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970)).  But the right to be free of visible physical restraints "may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." *Deck v. Missouri*, 544 U.S. 622, 628 (2005) (collecting cases).  If a petitioner successfully shows a shackling violation, the government bears the burden showing that

United States District Court
Northern District of California

1   the error was harmless, i.e., that the jury would have found petitioner guilty absent the error.

2   *Dixon v. Ryan*, 932 F.3d 789, 809 (9th Cir. 2019). In determining whether the imposition of

3   visible restraints constitutes prejudicial error, reviewing courts often consider the appearance and

4   visibility of the restraining device, the nature of the crime with which the defendant was charged,

5   and the strength of the state's evidence against the defendant. *See Dyas v. Poole,* 317 F.3d 934,

6   937 (9th Cir.2003) (per curiam). If a defendant is charged with a violent crime, then the risk of

7   prejudice increases because shackling conveys an impression that he is violent. *Id.*

8        Mitchell has not demonstrated that the California Court of Appeal's rejection of his due

9   process shackling claim was objectively unreasonable. First, the Court of Appeal reasonably

10  concluded that the use of restraints was justified because Mitchell was not restrained in the trial

11  until only after his violent and disruptive conduct made restraints necessary. The trial court

12  ordered Mitchell to be shackled—outside the presence of the jury—only after Mitchell threw a

13  packet of papers at the judge and tipped over the counsel table. *Mitchell*, 2010 WL 259083, at

14  *18, 20. Similarly, the appellate court noted that Mitchell was removed from the courtroom only

15  after being warned for those prior outbursts and continuing to disrupt the court by singing a

16  modified version of "Amazing Grace" over the trial court's discussion of jury instructions. *Id.* at

17  *21, 23. Only when Mitchell continued singing louder to interrupt the prosecution's closing

18  argument did the trial court remove him from the courtroom and ask his advisory counsel to take

19  notes. *Id.* at *18–20.

20       Second, the court reasoned that any prejudice resulting from a potential shackling violation

21  was harmless because the restraints were only visible briefly when he was ordered to leave the

22  courtroom during closing argument and the "evidence of Mitchell's guilt was overwhelming." *Id.*

23  at *22. That the jury's brief sight of Mitchell in restraints occurred during closing argument by

24  itself is not enough to warrant a finding of prejudice. *See United States v. Halliburton*, 870 F.2d

25  557, 559-61 (9th Cir. 1989) (holding that a "brief and inadvertent display of [the defendant] in

26  handcuffs" was not inherently prejudicial). Without more evidence suggesting that the use of

27  shackles had a substantial impact on the jurors, and in the face of strong evidence of guilt, a

28  "fairminded jurist could determine that the harmlessness determination was not objectively

unreasonable" such that Mitchell is not entitled to relief under AEDPA. *See Frye v. Broomfield*, 115 F.4th 1155, 1165–66 (9th Cir. 2024) (finding that the state court's determination of harmlessness for a shackling violation was not objectively unreasonable given the limited use of shackling, the lack of evidence in the record indicating many jurors seeing the shackles, and the evidence of the petitioner's guilt, including credible eyewitness testimony and corroborating physical evidence).

Accordingly, Mitchell has not demonstrated that the California Court of Appeal's rejection of his due process claim relating to the visible use of restraints and subsequent removal from the courtroom was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts.

**D.      Whether Advisory Counsel Violated Mitchell's Right to Self-Representation**

The California Court of Appeal summarized the background of Mitchell's *Faretta* claim as follows:

> After advisory counsel's appointment, Mitchell asked for counsel to play a greater role, stating: "I'm not going to do anything. . . . I'm going to let him handle the case." The trial court explained: "He's only going to be assisting you." Later, Mitchell asked that the trial court allow advisory counsel to cross-examine witnesses. The court denied these requests, explaining: "That's not allowed. . . . [¶] . . . [¶][H]e's not here to ask questions. He's just here to advise you. [¶] . . . [¶] That's not the role of advisory counsel, no. He's not co-counsel. He's not counsel. He's only here in a limited capacity to advise  . . .  you on certain legal issues." The trial court allowed advisory counsel to suggest questions for Mitchell's cross-examination.
>
> Mitchell's complaint here relates to advisory counsel's involvement with Dr. Ford, a DNA expert engaged for the defense. On the day Dr. Ford was expected to testify, the record reflects the following discussion outside the presence of the jury:
>
> "THE COURT: All right. The next thing that I wanted to say is that we had allocated $2,000 for a DNA expert. And [advisory counsel] has just presented me with a bill that came to $3,344, and that was from DNA expert Simon Ford, Ph.D., who is writing a report and has his record of the work that he did in this case. [¶] And [advisory counsel], did you have a chance to speak with Dr. Ford about testifying in court?
>
> "[ADVISORY COUNSEL]: Yes. He is still involved in the San Mateo thing. He is on standby. He has to be there. If he's not there today, he's supposed to be there tomorrow. And—

United States District Court
Northern District of California

1    "THE COURT: He couldn't come in here today for a little while?

2    "[ADVISORY COUNSEL]: He's on standby. He has to be within an
3    hour away. He has to be there within an hour from the phone call.

4    "THE COURT: So he would not come in today and testify if we asked
     him to?

5    "[ADVISORY COUNSEL]: No. The reason is that he's, you know,
6    if they called him, he's got to go.

7    "THE COURT: All right. And did you have a chance to talk to him
     about what he would say if he were to testify?

8    "MR. MITCHELL: Your Honor, that's hearsay.

9    "THE COURT: We're not in front of the jury. This is for my records.

10   "[ADVISORY COUNSEL]: Yes, Your Honor. I believe earlier I had
     indicated to the Court what he would say if he were called to testify.
11   The biggest thing he would say is that he—and I'm not sure if I should
     do this in front of the prosecutor or not. If the Court wants me to I
12   will.

13   "THE COURT: Yeah, I do want you to.

14   "[ADVISORY COUNSEL]: The biggest thing is he would disagree
     with the statistics for two reasons. The first reason being since it's
15   from a database, he thinks the statistics should be adjusted in the
     defendant's favor, No. 1. [¶] No. 2, he classifies the male profile that
16   was obtained from the sperm fraction as being a mixture as opposed
     to a single source. And because of that, he would again adjust the
17   statistics in favor of the defendant. His adjustment out of 18 zeros, if
     you get rid of three, four, five zeroes, you still have a big number.
18   And it would not be very—

19   "THE COURT: He would get rid of three to five zeroes, and instead
     of it being one in one quadrillion, it would be one in—
20
     "[ADVISORY COUNSEL]: A couple hundred million or something
21   like that.

22   "[THE PROSECUTOR]: There's 18 zeroes. If you get only rid of
     three of them, you've still got 15 zeroes.
23
     "[ADVISORY COUNSEL]: Maybe you get it down to 12 zeroes.
24
25   . . .

26   "THE COURT: So in your opinion as an attorney, would you call
     such a witness?

27   "[ADVISORY COUNSEL]: No.

28   "THE COURT: Why not?

United States District Court
Northern District of California

"[ADVISORY COUNSEL]: He can't help me. We sought through cross-examination to bring out, flush out those points, and what you would have is ultimately Mr. Ford would not be disagreeing. He would just be making adjustments.

"THE COURT: Okay. And he is not available until when?

"[ADVISORY COUNSEL]: Next week. Next Monday. He's still involved in a murder case in San Mateo County.

"THE COURT: Now, if this were some testimony that would be beneficial to Mr. Mitchell, we would consider waiting. But in this situation where it's not going to benefit him in any way to have this witness testify—

"MR. MITCHELL: Your Honor, you don't know that.

"THE COURT:—then the Court is not willing to continue this matter until next Monday. Therefore, we're going to proceed. [¶] And do you have any further witnesses that you wish to call?

"MR. MITCHELL: (Shaking head from side to side.)

"THE COURT: Are you going to testify on your own behalf?

"MR. MITCHELL: My testimony is contingent upon examining the witness, the witness that [advisory counsel]—

"THE COURT: How could that be? There's a lot of stuff other than the DNA stuff. There's a lot of things that if you wanted to testify, you have the opportunity now."

A few pages later in the record, Mitchell asked "[h]ow in the hell am I acting like an attorney when he's doing every fucking thing[?]" The record then reflects the following discussion:

"THE COURT: All right. I'm not going to have this conversation with you. Are you going to testify?

"MR. MITCHELL: I want to testify after this witness, after this witness.

"THE COURT: You are not going to have this witness. We do not have another $2,000 for this witness, No. 1.[¶] No. 2, the witness cannot help you in any way.

"MR. MITCHELL: You don't know that.

"THE COURT: I've just talked to [advisory counsel].

"MR. MITCHELL: He's not the attorney.

"THE COURT: He has talked to that man.

"MR. MITCHELL: What man?

1    "THE COURT: Dr. Simon Ford.

2    "MR. MITCHELL: That's hearsay."

3    Later that same day, Mitchell stated: "I want my DNA witness here.
     [¶] . . . [¶] Why can't he be here if the Court paid the bill?" The court
4    responded: "Because he was not available."

5    *Mitchell*, 2010 WL 259083, at *14–15.

6    Mitchell argues that the appellate court unreasonably applied the law in finding that the

7    trial court did not violate his right to self-representation.  ECF No. 222 at 21.  More specifically,

8    Mitchell contends that it was unreasonable for the California Court of Appeal to conclude that

9    "'advisory counsel did not make a tactical decision, over Mitchell's objection, as to whether Dr.

10   Ford would testify,' or that the trial court did not 'resolve "disagreements" between Mitchell and

11   advisory counsel.'"  ECF No. 222 at 24 (quoting *Mitchell*, 2010 WL 259083, at *17).  He argues

12   that "the trial court was on notice that Mr. Mitchell and Mr. Billups did not see eye to eye on the

13   utility of Dr. Ford as a witness" and instead of resolving the dispute in Mitchell's favor as required

14   under the Sixth Amendment, the trial court sided with advisory counsel and proceeded with trial

15   without Dr. Ford.  *Id.* at 25.

16   When a defendant chooses to proceed pro se, a court may appoint stand-by counsel without

17   denying the right to self-representation.  *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984).

18   But the pro se defendant must be able to "preserve actual control over the case he chooses to

19   present to the jury" to maintain his *Faretta* right.  *Id.* at 178.  "Thus, *Faretta* rights are adequately

20   vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to

21   address the court freely on his own behalf and if disagreements between counsel and the *pro se*

22   defendant are resolved in the defendant's favor whenever the matter is one that would normally be

23   left to the discretion of counsel."  *Id.* at 179.

24   The California Court of Appeal reasoned as follows in rejecting Mitchell's *Faretta* claim

25   here:

26   In any event, contrary to Mitchell's contention here, advisory counsel
     did not make a tactical decision, over Mitchell's objection, as to
27   whether Dr. Ford would testify. Nor did the trial court resolve
     "disagreements" between Mitchell and advisory counsel. The record
28   instead shows that advisory counsel only informed the court of Dr.

United States District Court
Northern District of California

> Ford's unavailability, and made an offer of proof at the court's request as to his anticipated testimony, so that the court could determine if a continuance was appropriate. Advisory counsel did not decide whether Dr. Ford would be called to testify. "Participation by [advisory] counsel to steer a defendant through the basic procedures of trial is permissible. . . ." (McKaskle, supra, 465 U.S. at p. 184.)

*Mitchell*, 2010 WL 259083, at *17 (footnote omitted).

Mitchell has not demonstrated that the appellate court's determination was objectively unreasonable. As the appellate court noted, the discussion over Dr. Ford's utility took place in the context of the trial court's assessment of whether a continuance was appropriated given Dr. Ford's unavailability on the day of his scheduled testimony. There was thus no express disagreement over trial strategy—as whether to continue the trial was within the trial court's discretion. Instead, the trial court solicited information from advisory counsel about Dr. Ford's anticipated testimony—which Mitchell did not dispute—and then independently made its own judgment that Dr. Ford's testimony would not be sufficiently helpful to warrant a continuance. While Mitchell expressed that the trial court "[didn't] know that" the testimony would not be useful, this did not amount to a disagreement in trial strategy with *advisory counsel*. Accordingly, Mitchell has not demonstrated that the California Court of Appeal's rejection of his claim that the role of advisory counsel violated his *Faretta* right to self-representation was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts.

### E.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

United States District Court
Northern District of California

473, 484 (2000).

Here, Mitchell has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is denied, and a certificate of appealability is denied. The Clerk shall enter judgment in favor of Respondent and close the file. Additionally, the Clerk is directed to substitute Dao Vang on the docket as the Respondent in this action.

**IT IS SO ORDERED.**

Dated: June 24, 2025

JON S. TIGAR
United States District Judge